**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(ORLANDO DIVISION)**

| | |
|---|---|
| DECLAN FLIGHT, INC. and RIGHT RUDDER AVIATION, LLC | ) ) ) ) |
| Plaintiffs, | ) Cause No. ) |
| v. | ) Jury Demanded ) |
| TEXTRON, INC., and TEXTRON eAVIATION, INC. | ) ) ) |
| Defendants. | ) ) |

<u>**ORIGINAL COMPLAINT**</u>

Declan Flight, Inc. ("Declan") and Right Rudder Aviation, LLC ("RRA") (collectively, "Plaintiffs") allege, based upon knowledge, information, and belief, as follows:

**I.  NATURE OF THE ACTION**

1.    This case illustrates the ruthlessness of one of the largest publicly traded companies in the United States — Textron, Inc. ("Textron").  Textron, a Fortune 500 company with a market capitalization of approximately $13.1 billion, undertook a calculated plan to not only enrich itself and its subsidiaries at the expense of Declan and RRA, but to ruin the Plaintiffs and their businesses in the process.  Textron conducted this malicious and illicit scheme in a variety of ways, including through its wholly owned subsidiary Defendant Textron eAviation, Inc. ("Textron eAviation").

2.    On March 17, 2022, Textron announced that it had entered into an agreement to purchase Pipistrel d.o.o., Pipistrel Vertical Solutions d.o.o. ("Pipistrel Vertical") and Pipistrel Italia S.r.l. ("Pipistrel Italia") (Pipistrel d.o.o., Pipistrel Vertical and Pipistrel Italia shall collectively be referred to as "Pipistrel").  (Exhibit A).  Textron described Pipistrel as "a leader

in electrically powered aircraft, based in Slovenia and Italy." The purchase price was approximately 218 million Euros. It was also reported that, upon closing of the transaction, Textron intended to form a new business segment, Textron eAviation, that would be "focused on the development of sustainable aircraft, which will include Pipistrel."

3.      Pipistrel was founded in 1989 by Ivo Boscarol. According to the Textron press release, Mr. Boscarol "will remain a minority shareholder as well as Chairman Emeritus, consulting on future product plans and strategies for a two-year period." From a relatively humble beginning manufacturing hang-gliders, Pipistrel became wildly successful. As described on its website, "[w]ith its revolutionary ideas, Pipistrel introduced composites to microlight and light sport aircraft, achieved first ever electric flight of two- and four-seater [aircraft], won all 3 NASA challenges and won the hearts of passionate aviators on all continents." Perhaps most significantly, on June 10, 2020, Pipistrel's Velis Electro became the first electric airplane to ever receive certification from the European Union Aviation Safety Agency, setting a milestone in aviation history. Civilian certification of the Velis Electro in the United States is very much in the near-term foreseeable future. Military uses of the aircraft do not require civilian certification.

4.      In order to market, distribute, sell and service its products on a worldwide basis, Pipistrel engaged the services of Declan and RRA. On October 2, 2020, Declan entered into a contract with Pipistrel Vertical whereby Declan would serve as "an independent entrepreneur with the role of Chief sales representative for special products and engineering services globally as well as unmanned (UAV) and [optionally piloted vehicle] program . . . for Americas market, and also broader sales support services." (Exhibit B). This contract was later renewed on November 30, 2021, with Declan serving as "an independent entrepreneur with the role of Head of Business Development for special products and engineering services as well as unmanned (UAV) and [optionally piloted vehicle] program . . . for America's market, and also broader if the

two parties recognize a specific case." (Exhibit C). For the services it provided, Declan was to receive, among other things, a commission in form of a 5% success fee on all "achieved and paid revenues from sales (without upper limit)." This contract ran through December 31, 2024. Declan's performance under its contract with Pipistrel Vertical was complete and exemplary.

5.      With respect to RRA, on September 21, 2021, it entered into a distribution contract with Pipistrel d.o.o. and Pipistrel Italia whereby RRA became the exclusive distributor in the United States for certain enumerated piloted 2- and 4-seat aircraft. (Exhibit D). In summary, RRA was granted an agreed upon "discount" on the planes that it purchased from Pipistrel d.o.o. and Pipistrel Italia that RRA would then sell at market price to its customers. In essence, this "discount" amounted to RRA's commission for its efforts. RRA's contract with Pipistrel d.o.o. and Pipistrel Italia was for an initial 24-month term and included an important provision providing that, so long as RRA met the sales projections set forth in the "Distribution Plan" incorporated expressly into the contract, the contract would be "maintained" into the future. As with Declan, RRA's performance under its contract was complete and exemplary. Significantly, between the two contractual relationships described above, Declan and RRA would be managing between 80 to 90% of Pipistrel's total sales.

6.      On April 15, 2022, Textron's purchase of Pipistrel was consummated. The principal of Declan, Bryan Wood, was instrumental in introducing Textron and Pipistrel and worked diligently for months to assist and facilitate the Textron and Pipistrel deal. During the course of this work, Mr. Wood was repeatedly told by Textron officers that Textron recognized his value to Pipistrel, Textron appreciated his work, and Textron was looking forward to collaborating with him in the future. Additionally, prior to the purchase, Textron informed RRA that it intended to rely on the current distributorship network and that it "did not have plans to change these established and beneficial relationships." None of the foregoing was true. In fact,

Textron's CEO, Scott Donnelly, let the proverbial "cat out of the bag" in an April 28, 2022 earnings call with investors. According to Mr. Donnelly, "[b]y the way, obviously part of what we're doing with Pipistrel is leveraging [the Textron] sales team all around the world that's selling our aircraft today under the Cessna and Beechcraft brands, will also be out there selling and servicing the Pipistrel brand." According to Mr. Donnelly, "[i]t's what we do." (Exhibit E). Unfortunately for Declan and RRA, Textron made good on Mr. Donnelly's plan and cut the Plaintiffs out of their respective roles, stole their contractual benefits, and carried out an illicit scheme against the Plaintiffs to destroy their businesses. These acts were carried out in the spirit of mischief with criminal indifference to civil obligations.

7.      Somewhat contemporaneously, Textron formed Textron eAviation. According to Textron eAviation's website, it is a business segment of Textron "that is pursuing ***Textron's*** long-term strategy to offer a family of sustainable aircraft for urban air mobility, general aviation, cargo and special mission roles." (Emphasis added). Textron eAviation is led by Robert Michael Scholl, who has worked for Textron in various capacities since 2007. When Textron purchased Pipistrel it named Gabriel Massey as president and managing director of the company. Mr. Massey oversees Pipistrel's "growth strategy, product development and integration within ***Textron***." (Emphasis added). Like Mr. Scholl, Mr. Massey has worked for Textron for a number of years, most recently as a vice-president of customer service at Textron Aviation, a company also owned and controlled by Textron.

8.      On June 6, 2022, Textron eAviation, which is owned and controlled by Textron, provided a contract termination letter ***on Textron eAviation letterhead*** to Declan claiming that Declan's contractual counterparty, Pipistrel Vertical, "has had a change in ownership due to an asset sale thereby making the continued cooperation of the Contracting Parties ***impossible***." (Exhibit F (emphasis added)). This alleged impossibility claim was mere pretext and is

demonstrably untrue.  The claim is belied by the fact that Declan had continued performing cooperatively under its agreement both before and after the acquisition.  Furthermore, Textron eAviation had been attempting to hire Declan's principal, Mr. Wood, to go to work for Textron eAviation at a greatly reduced compensation rate than what Declan was entitled to under its then existing contract with Pipistrel Vertical.  It was only after Mr. Wood informed Textron eAviation that Declan preferred to continue to perform under its current contractual arrangement that Textron eAviation claimed that it was "impossible" to honor Declan's contract.

9.      Textron and Textron eAviation likewise set their sights on RRA, aiming to destroy its business too.  During the Pipistrel acquisition due diligence process it became apparent to Mr. Wood that Textron intended to disband Pipistrel's existing distribution network.  After RRA obtained a very large fleet sale (100 aircraft) to Mesa Airlines ("Mesa") in August of 2022, Textron eAviation picked up the pace on its malicious and illicit plan to steal RRA's business and ruin its operations.  Textron and Textron eAviation recognized that RRA stood to be rewarded well for its efforts and recognized that RRA was likely in line to acquire many more fleet sales and thus many more millions of dollars in commissions.  Plainly stated, Textron and Textron eAviation wanted such monies and such sales for Textron and its related entities and business segments and took actions to eliminate RRA as a competitor.  Textron and Textron eAviation thus began intentionally and actively interfering with the agreement that RRA had signed with Mesa as one part of an overall scheme to ruin RRA's business.

10.      Textron and Textron eAviation engaged in this wrongful conduct even though this deal with Mesa had specifically been approved, and, in fact, encouraged, by Pipistrel. Nevertheless, Textron and Textron eAviation insisted on re-working the deal in a way that would have resulted in less commissions to RRA and its overall business.  At the same time, RRA was presented with a draft of a revised distribution agreement that would require RRA to inform

Pipistrel of any proposed "fleet" sale (5 or more aircraft).  Moreover, this draft distribution agreement gave Pipistrel the right to make fleet sales directly without the involvement of RRA and any compensation to RRA would be determined in Pipistrel's sole discretion.  RRA understandably had no interest in that absurd proposal, given its existing contractual rights , and Textron eAviation well understood that RRA would have no interest in proceeding forward under those revised terms.  Ultimately, on November 11, 2022, Pipistrel d.o.o. and Pipistrel Italia, at the direction of Textron and Textron eAviation, sent a notice terminating RRA's distribution contract.  Although many grounds for termination were set forth in that letter, none of them justify termination and they were entirely pretextual.

11.    Textron and Textron eAviation's actions were intentional, malicious, unjustified, outrageous, and wrongful.  The tortious interference with Declan's and RRA's contracts is manifest, but Defendants' actions go far beyond just that. Defendants — whose actions include, but are not limited to, the intentionally false characterization of the true terms of the Textron-Pipistrel transaction, the ginned-up impossibility defense, outright lies about discontinuing the product lines that Declan was contractually entitled to support as an agent, cutting RRA out of appearances at trade shows, suppression of business leads to RRA for additional sales, stealing the Mesa contract, ruining other actual and likely contracts, disparaging the Plaintiffs, obstructing the payment of commissions already due and owed, encouraging others to sue RRA for problems caused by Textron eAviation, promoting falsehoods about continuing business with Declan and RRA while they were actively undermining such efforts, setting up meetings with hidden or falsely promoted agendas, and other attempts to destroy the Plaintiffs' businesses — all speak to malice, moral turpitude, and illicit plans and acts that were conceived in the spirit of criminal mischief or with criminal indifference to the civil obligations involved. Indeed, the Defendants were criminally indifferent to civil obligations because they were not worried about incurring

potential civil liability because the money to them was a small amount for a $13.1 billion company (Textron) but an essential amount for the two small companies. As a result, Declan is now a shell of a company, Mr. Wood is no longer acting as an agent to facilitate the sales of aircraft, and the operations of RRA have been gravely injured. Indeed, the malicious conduct described herein is so severe that it warrants not only an award of actual damages but also the imposition of punitive damages to express society's collective outrage at the actions of the Defendants. Declan and RRA seek to vindicate their rights by this lawsuit.

## II. THE PARTIES

12. Declan is a corporation organized and existing under the laws of Arizona with its principal place of business in Scottsdale, Arizona.

13. Right Rudder is an LLC created under the laws of Florida. Right Rudder's principal place of business is located in Florida.

14. Textron is a corporation organized under the laws of Delaware. Its principal place of business is in Rhode Island. It may be served with process through its registered agent, CT Corporation, 1200 S. Pine Island Road, Plantation, Florida 33324.

15. Textron eAviation is a corporation organized under the laws of Delaware. Textron eAviation's principal place of business is in Kansas. Textron eAviation may be served with process through its registered agent, CT Corporation, 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603. Textron eAviation is a wholly owned subsidiary of Textron.

## III. JURISDICTION AND VENUE

16. Declan is a citizen of Arizona.

17. RRA is a citizen of Florida because each of its members/owners are residents of and citizens of Florida. Specifically, RRA is owned by Andrew Chan and Charles Lawson. Both individuals reside in Florida.

7

18.     Textron is a corporation organized under the laws of Delaware. Textron's principal place of business is in Rhode Island.

19.     Textron eAviation is a corporation organized under the laws of Delaware.  Textron eAviation's principal place of business is in Kansas.

20.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because Declan, RRA, Textron and Textron eAviation are residents of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

21.     This Court has personal jurisdiction over Textron and Textron eAviation because both have sufficient contacts with the forum to warrant the imposition of jurisdiction over them by this Court.  As described herein, Textron and Textron eAviation have directed their tortious activities towards a resident of Florida (RRA) that was performing its contractual obligations in Florida.  Moreover, Textron is a multi-billion dollar conglomerate, registered to do business in Florida, with over 34,000 employees and conducts business worldwide. Textron regularly conducts business in the State of Florida and, according to its own website, has nine locations within the state, including four locations within this district. Additionally, as will be explained further below, Textron eAviation's Rob Scholl  made a specific trip to Florida to meet with RRA in furtherance of Textron eAviation's illicit plan to tortiously interfere with RRA's contractual relationship with Pipistrel and injure its business overall.  Mr. Scholl joined Textron Aviation, a division of Textron, in 2012 and has held a variety of roles, including senior vice president of sales and marketing.  Since 2007, Mr. Scholl has been employed by Textron or one of its affiliate entities. In March 2021, he was named senior vice president of Textron eAviation.  In April 2022, Mr. Scholl was promoted to President and CEO of Textron eAviation.

22.     Furthermore, Steve McKenna, a former Textron employee and current Director of Sales and Marketing for Pipistrel, recently came to Florida for the specific purpose of interfering

with RRA's dealership network, disparaging RRA, and ruining RRA's business overall.  Upon information and belief, Mr. McKenna was acting at the specific direction of Textron and Textron eAviation.  Such information and belief is based on the appearance, as described below, that every facet of Pipistrel's operations is now directed and controlled by Textron and Textron eAviation. Textron eAviation also regularly conducts business in Florida such that the Court may exercise general jurisdiction over this Defendant.  Specifically, Textron eAviation was a presenter of Pipistrel aircraft at the 2022 NBAA Business Aviation Convention & Exhibition held in Orlando, Florida, where it had a display. As described below, this was one of many acts of tortious interference.  Furthermore, at that same event, Mr. Scholl participated in a panel discussion.

23.    Venue of this case is proper under 28 U.S.C. §§ 1391(b)(2)(3) because many of the acts and occurrences complained of herein occurred within this judicial district. Further, RRA has its principal place of business in this district and, as shown, Textron conducts business within this district.

## IV.  FACTUAL BACKGROUND

### A.  Textron Acquires Pipistrel — The Malicious and Illicit Scheme Begins

24.    On April 18, 2022, Textron, through its Slovenian limited liability company, announced that it had closed on its acquisition of Pipistrel (and various affiliates).  Textron first announced its purchase of Pipistrel on March 17, 2022. As part of that announcement, Textron wrote that "[a]s a Textron company, Pipistrel will have access to greater resources, technical and regulatory expertise *and a global aircraft sales and support network*, enabling it to accelerate its development and certification of electric and hybrid electric aircraft." (Emphasis added). Gabriel Massey, a Textron executive who was named as president and managing director of Pipistrel, stated in an interview in May 2022 that with respect  to Pipistrel, "[t]he resources and knowhow that *Textron* can provide is meant to accelerate product development." (Emphasis added).

25.    Textron owns and controls Textron eAviation. Textron stated that Pipistrel would be "part of *Textron's* newest business segment, Textron eAviation, which will pursue Textron's long-term strategy to offer a family of sustainable aircraft for urban air mobility, general aviation, cargo and special mission roles."  (Emphasis added). Indeed, Antonio LaCorte, the Director of External Affairs for Textron eAviation, remarked that "Pipistrel is part of our holistic, collaborative effort to advance the goals of *Textron as a whole*." (Emphasis added).

26.    Textron advertised on its website that Pipistrel continues to exist and lends its expertise to Textron through the acquisition. "Taking the lead in Textron's development of sustainably powered flight, Textron eAviation is leveraging the industry-leading product design, certification, manufacturing, and aftermarket solutions from across Textron's businesses coupled with the newly acquired expertise of Pipistrel."

**B.  Declan — No Good Deed Goes Unpunished**

**1.  Declan — A Success Story**

27.    Declan was formed on September 17, 2020, by its owner and CEO, Mr. Wood. Prior to forming Declan, Mr. Wood was the founder and senior director of hybrid electric and electric propulsion systems at Honeywell International, Inc. ("Honeywell"), a Fortune 100 company that, among other things, builds aircraft and aircraft engines through its aerospace business unit. While at Honeywell, Mr. Wood developed a comprehensive strategy that covered turbine engines, generators, motors, controllers and energy storage access across the vertical take-off and landing space, general aviation, as well as small and commercial aircraft. Through this work, Mr. Wood established key relationships with industry players, including 100-plus aerospace original equipment manufacturers, fleet operators, network providers, academia, and regulatory committees. Mr. Wood's knowledge, expertise and industry relationships were all brought with him to Declan and proved to be highly beneficial to Pipistrel.

**2. Declan Contracts with Pipistrel — The 2020 Contract**

28.    In October 2020, approximately 18 months before Textron bought Pipistrel, Pipistrel and Declan entered into a "Contract of Business Cooperation no. 04/2020" (the "2020 Contract"). (Exhibit B). Following an extension, the 2020 Contract ran through December 31, 2021. The 2020 Contract was drafted by Pipistrel and is written in both the Slovene and English languages. The translation of the 2020 Contract from Slovene to English was completed by Pipistrel. Pipistrel is identified as the Contracting Authority under the 2020 Contract. Declan is identified as the Service Provider under the 2020 Contract. Both Pipistrel and Declan are referred to as the Contracting Parties.

29.    The 2020 Contract provides that Declan would serve as "an independent entrepreneur with the role of Chief sales representative for special products and engineering services globally as well as unmanned (UAV) and [optionally piloted vehicle] program (as per point 2 of this contract) for Americas market, and also broader if two parties recognize a specific case." (Exhibit B at § 1.1). As part of its charge under the 2020 Contract, Declan was required to spearhead the sales of the Pipistrel products and provide sales support services. (Exhibit B at § 2.6).

30.    In exchange for providing these services, the 2020 Contract provided Declan with various forms of compensation and expense reimbursement. For the sales services under § 2.6(a), Declan was to receive 12,000 Euros monthly and a commission in form of a 5% success fee on all "the value of the confirmed new orders ie. revenues achieved (without upper limit)." (Exhibit B at § 4.1). Declan is owed not less than 101,586 Euros for unpaid success fees under the 2020 Contract. In the future, an additional 102,800 Euros in success fees will become due and owing under the 2020 Contract based on sales already made. Although it is undisputed that these amounts are due and owing, or will become due and owing, to Declan, Textron eAviation has and

11

continues to refuse to allow Pipistrel to pay these amounts without a release of all other Declan claims.

### 3. Mr. Wood Introduces Pipistrel to Textron

31.    Shortly after the execution of the 2020 Contract, Mr. Wood, the principal of Declan, arranged a Zoom meeting between Textron and Pipistrel in October 2020 to discuss opportunities and synergies between the two companies. Mr. Wood, who had prior investment banking and merger and acquisition experience, had been assisting Pipistrel in its capital-raising efforts. In fact, this past experience was one of the specific reasons that Pipistrel wanted to work with Declan. Over the next year, in excess of thirty meetings and/or telephone conferences occurred between Textron, Mr. Wood and Pipistrel, including, but not limited to, an April 13, 2021 in-person meeting in Dallas and several dinner meetings involving Mr. Wood and Rob Scholl.

32.    The result of Mr. Wood's efforts was an "all hands" meeting that occurred in Italy and Slovenia on October 15 and 16, 2021 to discuss Textron's possible acquisition of Pipistrel. The following people were at that meeting: Mr. Wood, Ivo Boscarol (Principal of Pipistrel), Masa Certalic (Pipistrel CFO), Tine Tomazic (Pipistrel CTO), Rob Scholl (SVP Textron), Scott Hegstrom (Global Head of M&A Textron), Chris Hearne (SVP -Engineering, Textron Aviation), and Brian Cox (Engineering Manager/Director from Bell). A few days after this meeting, Mr. Scholl and Mr. Wood had dinner in Las Vegas to further discuss the Pipistrel deal.

33.    Mr. Wood's efforts were successful. On March 17, 2022, Textron filed a Form 8-K with the SEC announcing its purchase of Pipistrel for approximately 218 million Euros. Textron also announced that its new reporting segment, Textron eAviation, would include Pipistrel. However, as Defendants knew, Textron eAviation is not merely a business unit or reporting segment of Textron; instead, it is a corporation having been incorporated in Delaware on April 1,

2022. Also, in April 2022, Mr. Scholl was named as the CEO and President of Textron eAviation.

34.    On March 17, 2022, the same day as the 8-K referenced above was filed, Mr. Scholl contacted Mr. Wood to thank him for his contribution to the Textron-Pipistrel deal.  He also asked Mr. Wood whether he would be interested in a full-time Director-level position at Textron eAviation.  Mr. Wood said he would consider it, but that they would need to address Declan's rights and obligations under the 2022 Contract (discussed below) fairly.  Mr. Scholl indicated he would prepare an offer and send it to Mr. Wood shortly.

### 4.    Declan Enters into a Second Contract with Pipistrel — The 2022 Contract

35.    In late 2021, several months prior to Textron's purchase of Pipistrel, and while Mr. Wood was facilitating meetings between Textron and Pipistrel that culminated in Textron's acquisition of Pipistrel, Pipistrel and Declan entered into a second "Contract of Business Cooperation no. 04/2020" (the "2022 Contract") which was, in effect, a further extension of the 2020 Contract.  (Exhibit C).  When the 2022 Contract was entered into Mr. Boscarol expressed by e-mail dated November 30, 2021 that he was "really happy that we have so good cooperation (sic) and [he was] convinced that we will be very successful together also in the future."

36.    The 2022 Contract, which Pipistrel drafted, expressly identifies that it will last for at least an initial three-year term — January 1, 2022 through December 31, 2024.  (Exhibit C at § 8.2). The 2022 Contract is written in both the Slovene and English languages. The translation of the 2022 Contract from Slovene to English was completed by Pipistrel. Pipistrel is identified as the Contracting Authority under the 2022 Contract. Declan is identified as the Service Provider under the 2022 Contract. Both Pipistrel and Declan are referred to as the Contracting Parties in the 2022 Contract.

37.    The 2022 Contract says that Declan would serve as "an independent entrepreneur with the role of Head of Business Development for special products and engineering services as

well as unmanned (UAV) and [optionally piloted vehicle] program (as per point 2 of this contract) for America's market, and also broader if the two parties recognize a specific case." (Exhibit C at § 1.1). As part of its charge, Declan was required to spearhead the sales of Pipistrel products and provide sales support services. (Exhibit C at § 2.6). Declan was required to meet certain sales volume benchmarks. For 2022, Declan had to generate new contracts or new orders valued at not less than 5 million Euros. (Exhibit C at § 2.7).

38.    Declan was on track to easily surpass this threshold in 2022. By June 2022, Declan had already delivered more than 228 million Euros of new business commitments, represented by closed sales, Letters of Intent  and Memorandums of Understanding. In fact, Declan's efforts on Pipistrel's behalf resulted in a Letter of Intent between Pipistrel and Customer A for the purchase of up to 100 of the NUUVA V300 cargo drone aircraft at a base price of 1,850,000 Euros for each plane for a total value of approximately 185,000,000 Euros. This Letter of Intent was signed on January 13, 2022.

39.    In exchange for providing these valuable services, the 2022 Contract provided Declan with various forms of compensation and expense reimbursement. For the sales services under § 2.6(a), Declan was to receive a commission in the form of a 5% success fee on all "achieved and paid revenues from sales (without upper limit)" (the "Commission"). (Exhibit C at § 4.1). For sales support services under § 2.6(b), Declan was to receive compensation at a rate of 73 Euros per hour for each hour worked every month (the "Hourly Fee"). (*Id.*). Finally, Pipistrel was to reimburse Declan for all travel costs incurred in pursuit of the sales and sales support services (the "Reimbursement Fee"). (Exhibit C at § 4.4).

40.    Upon information and belief, and based on Mr. Wood's conversations with Textron employees, the Commission, Hourly Fee, and Reimbursement Fee Declan was entitled to under the 2022 Contract was more generous than the compensation packages Textron presently

offers its employees in its global aircraft sales and support network.

41.    Under Article 8, titled "Duration and termination of the contract," the 2022 Contract provides for only two mechanisms the parties could employ to terminate the contract prior to its natural expiration. First, neither party had the unilateral right to terminate the 2022 Contract early unless: (i) the other party was late in complying with its contractual obligations or (ii) the other party breached its obligations under the contract and did not cure its breach within a reasonable time following notification of the breach (the "For Cause Termination Provision"). (Exhibit C at § 8.3).

42.    Second, the 2022 Contract would automatically terminate if certain events occurred including, as relevant here, "when cooperation of the Contracting Parties becomes impossible in any way" (the "Automatic Termination Provision").  (Exhibit C at § 8.4). As described above, Declan always timely performed all of its material obligations under the 2022 Contract and continued to do so until Textron eAviation tortiously interfered with the 2022 Contract and otherwise attempted to ruin its business. Moreover, as evidenced by the facts described herein, cooperation between the Contracting Parties was not impossible.  In fact, it was just the opposite.

**5.    Textron and Textron eAviation — Tortious Interference and Other Misconduct, Part 1**

43.    Less than two months after announcing its acquisition of Pipistrel, Textron eAviation served Declan with a termination letter in regard to the 2022 Contract, thereby tortiously interfering with it. Specifically, on June 6, 2022, Mr. Scholl, President and CEO of Textron eAviation, and no doubt at the direction of Textron, gave Mr. Wood a letter on Textron eAviation letterhead purporting to provide Declan with "official notice" that "pursuant to Sections 4.5 and 8.4 of the [2022] Contract, that the Contract is hereby terminated." (Exhibit F).  This

appears to have been Textron's plan all along. Mr. Massey, in fact, remarked in May 2022 concerning the purchase of Pipistrel that "Textron Aviation and Textron have a global distribution network and sales network that we'll be leveraging."

44.    Prior to this interference and the other malicious actions surrounding it, Mr. Scholl and Mr. Wood had continued to discuss the possibility of Mr. Wood working directly for Textron eAviation. Based on a conversation that Mr. Wood had with Mr. Boscarol on February 18, 2022, Mr. Wood was aware that Mr. Scholl thought that Declan "made way too much" money for its role.   Nevertheless, on March 19, 2022, two days after Mr. Scholl initially mentioned the possibility of Mr. Wood working for Textron eAviation, the two once more discussed Declan's 2022 Contract and the possibility of Mr. Wood's employment.  After Mr. Scholl stated he thought the 2022 Contract expired at the end of 2022, instead of 2024, Mr. Wood informed him about many of the terms of the 2022 Contract, including the 2024 expiration date to which Mr. Scholl responded with surprise "Ivo [Boscarol] clearly did not think this through." Mr. Wood agreed to send Mr. Scholl an overview of the 2022 Contract, which he did later that day.

45.    Eight days later, on March 27, 2022, Mr. Scholl and Mr. Wood again discussed the 2022 Contract and the possibility of Mr. Wood working directly for Textron eAviation. Mr. Scholl told Mr. Wood that human resources was still working on the offer and that they were reviewing the 2022 Contact. In the meantime, Declan continued to perform its duties under the 2022 Contract by bringing customers to Pipistrel. For example, on March 24, 2022, Declan emailed the Pipistrel team with a proposal on a "Long-lead Propulsion system."  The total amount for the project was 4.412 million Euros and the customer was prepared to make a deposit of 2.326 million Euros. Then on April 4, 2022, Declan and another customer exchanged emails regarding delivery and deposit date schedules for other Pipistrel aircraft. Declan indicated that it was waiting for "Textron to provide further guidance on deposit requirements."

16

46.     A day later, on April 5, 2022, Declan obtained an NDA from Pipistrel and another potential customer with respect to a deal Declan was likely to obtain on behalf of Pipistrel. Moreover, based on Declan's efforts, Customer B signed a Letter of Intent with deposits to purchase 15 of the NUUVA V300 from Pipistrel on January 10, 2022. Declan was also working on a deal with a very large overnight carrier concerning the purchase of the NUUVA V300. These purchases were in addition to the 100 NUUVA V300 that Customer A had agreed to purchase through the Letter of Intent executed on January 13, 2022.  The success of Declan as it relates to the NUUVA V300 came as no surprise to Mr. Scholl, who previously told Mr. Wood after the closing of the Pipistrel transaction that the NUUVA product was going to make Pipistrel "a billion dollar company."

47.     On April 25, 2022, Declan had a meeting with Gabriel Massey, the new president and managing director of Pipistrel following its acquisition by Textron. Mr. Massey is a former Textron employee. At this meeting, Mr. Wood explained to Mr. Massey the terms of Declan's 2022 Contract with Pipistrel. Two days later, Declan obtained an NDA from Pipistrel (Mr. Massey) and Customer C with respect to a deal Declan was trying to put together on behalf of Pipistrel.

48.     Mr. Wood traveled to Wichita, Kansas on May 2, 2022, for a meeting with Mr. Scholl and Bob Gibbs, Vice-President of Special Missions at Textron Aviation, another company Textron owns and controls. Mr. Wood brought with him to this meeting another potential customer. After the meeting, Mr. Wood and Mr. Scholl had dinner at which time Mr. Scholl indicated to Mr. Wood that Textron eAviation could still make him an offer but that Textron eAviation could only slightly increase the monthly compensation that Declan was receiving under the 2022 Contract along with the potential for a small bonus (i.e., no 5% commission). Mr. Scholl's offer to Mr. Wood was consistent with Textron's announcement that it intended to use

its existing sales force to market Pipistrel's products. Of course, Textron's own sales force was paid less money than Declan was entitled to under the 2022 Contract.  Mr. Wood informed Mr. Scholl that Declan would just stick with the existing 2022 Contract.

49.     Although Mr. Wood declined to discuss potential employment further with Textron eAviation, Declan continued to perform its duties under the 2022 Contract. On May 6, 2022, Declan and Customer D exchanged emails regarding the sale of Pipistrel batteries. Declan then forwarded a presentation that provided an overview of the propulsion capabilities. Four days later, Declan emailed another potential customer about business opportunities with Pipistrel.

50.     Declan's work on behalf of Pipistrel came to fruition once more on June 5, 2022, when Pipistrel Vertical and a customer were prepared to enter into a Lithium-ion Battery Purchase Agreement in connection with the purchase of 6 propulsion battery packs.  The total purchase price was 128,832 Euros. Mr. Wood is listed as the "Primary Contact" for Pipistrel Vertical. On June 5, 2022, this contract was presented to Mr. Massey who stated, "[l]ooks like a good opportunity.  Are you looking for my approval/signature or do you need anything else regarding this?"

51.     Things changed, however, on the next day, June 6, 2022, when Mr. Wood traveled to Wichita, Kansas supposedly to meet with the Textron Special Missions Team to discuss ways that Textron and Declan could work together with the NUUVA and Surveyor product lines. Mr. Wood made this trip at the specific request of Mr. Scholl. However, instead of meeting with the Special Missions Team, which Mr. Scholl had indicated to Mr. Wood was the purpose of the meeting, Mr. Wood was led into a conference room by Mr. Scholl's assistant, Pam Dinwiddie. In the conference room were Mr. Scholl and Nicholas Begley (Finance Director for Textron Aviation). Mr. Scholl then ambushed Declan and Mr. Wood by handing a letter to Mr. Wood on Textron eAviation letterhead purportedly terminating Declan's 2022 Contract.  (Exhibit F).  Of

course, Textron eAviation was not a party to the 2022 Contract (neither was Textron) and Textron

eAviation, through Mr. Scholl, had lied to Mr. Wood about the purpose of his trip to Wichita.

52.     Enclosed with the letter was a draft Settlement Agreement offering to pay Declan

a lump sum of $100,000 and commissions of approximately 230,000 Euros. (Exhibit F).  Textron

eAviation also required Declan release all claims that it had against the "Textron Parties."  To be

clear, to this day Declan has not been paid a penny on the amount that it is undeniably and

admittedly owed apparently because Textron (a Fortune 500 company) believes it can simply

dictate terms to the much smaller Declan.  Moreover, the amount Textron eAviation offered was

significantly less than what Declan was owed. Mr. Scholl stated he was terminating Declan

because Textron eAviation did not plan to sell the products Declan was marketing (a falsehood)

and that the purchase between Textron and Pipistrel was an asset sale (another falsehood). These

statements were patently false.  Pipistrel still holds itself out to the public as offering for sale

special products and engineering services as well as unmanned (UAV) and optionally piloted

vehicles, which were the exact products Declan marketed pursuant to the 2022 Contract.

53.     Moreover, it is clear based on the statements Textron made when it purchased

Pipistrel that Textron and Textron eAviation intended, among other things, to cancel the 2022

Contract in order to misappropriate the benefits Declan was to receive under this contract and to

otherwise ruin Declan's business for their collective benefit. Indeed, as noted in the

announcement of the Pipistrel purchase, Textron had its own global sales force and network in

place — a sales force that was already being paid. Textron and Textron eAviation also believed

that Declan's total contract was too rich. Accordingly, Textron and Textron eAviation planned to

terminate the 2022 Contract because they recognized, among other things, the value of

misappropriating Declan's contract for themselves and turning Declan into a shell of the vibrant

and fast growing corporation it once was.

54.     Before Textron and Textron eAviation's wrongful interference with the 2022 Contract and other misconduct that that effectively destroyed the company, Declan, through its efforts, abilities, and contacts, had brought to Pipistrel numerous business opportunities in 2022, many of which had resulted in signed deals or signed letters of intent. Indeed, Declan had put together deals on Pipistrel's behalf with numerous businesses for which Declan has not yet been compensated.

55.     Several misrepresentations (otherwise known as lies) were made to Declan at the time of the interference with the 2022 Contract, thereby evidencing the improper motives. Besides representing that the sale of Pipistrel was an asset sale and representing that Textron eAviation no longer planned on selling Declan's product line, Textron eAviation stated that the factual basis for this unlawful termination was the suggestion that "Pipistrel Vertical Solutions, D.O.O. ('Contracting Authority') has had a change in ownership due to an asset sale thereby making the continued cooperation of the Contracting Parties 'impossible.'"   The sale, however, was not an asset sale, but rather was a stock purchase, meaning that Pipistrel continues its existence and remains the Contracting Authority. As the purchaser of Pipistrel, Textron knew this claim  was false. Furthermore, Textron eAviation's claim that cooperation between Declan and Pipistrel was impossible was not true. Indeed, this claim is contradicted by an email from Pipistrel's new president and managing director, Gabriel Massey, who told Declan on April 17, 2022, that he was "look[ing] forward to working together [with Declan]." Why would Textron and Textron eAviation make such representations that were clearly not true? Two reasons come to mind. First, Pipistrel, Textron and Textron eAviation knew they could not allege (nor have they alleged) a basis to terminate the 2022 Contract under the For Cause Termination Provision. Second, Textron is a multi-national conglomerate; whereas Declan was just a small one person company. Moreover, the alleged change in ownership through the stock sale did not make cooperation

between the Contracting Parties under the 2022 Contract impossible, as the facts stated herein demonstrate. As a result, the Automatic Termination Provision under section 8.4 is not applicable.

56.    In other words, the impossibility rationale proffered by Textron eAviation was just a pretext, no doubt directed by Textron. Indeed, as set forth above, Declan continued to perform its duties under the 2022 Contract after Textron had purchased Pipistrel. Moreover, cooperation between the parties continued after the purchase of Pipistrel, as is evidenced by the following conduct of Pipistrel and/or Textron and Textron eAviation:

(i)    paying Declan some Commissions owed on sales;

(ii)    furnishing Declan with sales leads in Asia, Europe, and the Americas;

(iii)    facilitating business meetings between Declan's Mr. Wood and Textron eAviation division President and CEO Robert Scholl to review the sales opportunities;

(iv)    Mr. Scholl's participation in sales calls with Declan and prospective customers; and

(vi)    approving Mr. Wood's travel plans for at least three different business trips.

57.    Textron and Textron eAviation relied on the impossibility pretext because they knew the 2022 Contract does not provide Pipistrel or Textron or Textron eAviation with an independent right to terminate the 2022 Contract for convenience. Instead, Section 4.5 recognizes Pipistrel's right to exercise its discretion to terminate the 2022 Contract under the For Cause Termination Provision embodied in Section 8.3. Indeed, if the 2022 Contract is terminated, apart from the propriety of terminating the contract for non-performance or for cause, Section 4.5 dictates that Pipistrel must still disburse to Declan the payments it is owed under Article 4.

58.    Because Declan was fully and faithfully performing its obligations under the 2022 Contract and performance was still possible even after the acquisition, there was no cause to terminate the contract. Accordingly, Textron and Textron eAviation tortiously interfered with the

2022 Contract when Declan was provided an unlawful termination letter and their claim of "impossibility" was just a pretext to avoid paying Declan the amounts it is due under the 2022 Contract and the amounts Declan would have earned had the 2022 Contract not been interfered with by Textron and Textron eAviation. This tortious interference is but one act in a litany of acts designed to ruin Declan and, in fact, effectively put it out of business.

59.    Declan has been damaged by Textron and Textron eAviation's tortious interference and other wanton and willful misconduct described herein. If Textron and Textron eAviation had not improperly canceled the 2022 Contract, then Declan would have been paid approximately $1.4 million in Commission based on customer commitments already presented. Additionally, with respect to the Letters of Intent discussed above, Declan stood to make in excess of $10 million in the aggregate on two deals alone. Based on Declan's efforts and proven track record of success and the bright future of electronic aviation, Declan would have undoubtedly earned millions more in additional Commission and Hourly Fees over the course of the 2022 Contract had Textron and Textron eAviation not tortiously interfered with same. As a direct and proximate result of the misconduct of the Defendants, however, Declan is now a mere shell of a company. In simple terms, Textron and Textron eAviation's nefarious conduct succeeded in destroying Declan.

**C. RRA — A Victim of its Own Success**

**1. RRA — A Success Story**

60.    RRA was founded in 2016 by Andrew Chan and Charles Lawson. RRA's stated mission was "to not only provide opportunities for flight and related services to current pilots but also facilitate flight training and innovative technologies to all aviation enthusiasts." In September 2018, RRA was selected as the Fixed Base Operator of the Inverness Airport in Inverness, Florida. RRA is now a full-serve aerospace firm providing services such as airport

management, flight training, maintenance facilities, aircraft sales and aircraft management.

61.     In August of 2021, RRA entered into discussions with Pipistrel to become its exclusive distributor in the United States.  At that time Pipistrel was experiencing significant issues with its existing distributor.  RRA had an existing relationship with Pipistrel in that it had served as a dealer selling certain Pipistrel products.  At this time, other aircraft manufacturers were pursuing RRA to operate as distributors for their products, but RRA saw the growth potential for Pipistrel and chose to pursue the opportunity with Pipistrel. As part of the distributorship due diligence process, RRA presented Pipistrel with a "US Distributor Plan" (the "Distribution Plan"). (Exhibit G).  As discussed below, this plan was subsequently agreed to and expressly incorporated into the agreement that ultimately was entered into between the parties.  In the Distribution Plan, RRA identified a litany of existing problems at Pipistrel, including no coherent strategy, a fragmented and weak dealership network, no marketing plan, the lack of customer support that led to many unhappy customers, a lack of service centers, and an overall lack of quality control. In the Distribution Plan, RRA set forth its plan to correct the existing problems by elevating the Pipistrel brand and increasing U.S. sales "by orders of magnitude."

62.     After weeks of negotiations, on September 27, 2021, RRA entered into a Distribution Contract for Piloted 2 & 4 Seat Aircraft Program (the "Distribution Contract") with Pipistrel d.o.o. and Pipistrel Italia.  (Exhibit D).  Under the terms of the Distribution Contract, RRA became the exclusive distributor in the United States for certain enumerated products, including, but not limited to, the Alpha, Sinus, Virus and Panthera aircraft.  The Distribution Contract was structured so that RRA would purchase the aircraft from Pipistrel at an agreed upon price and then re-sell that aircraft to the ultimate customer or user.  For purchases of the 2-seater aircraft (such as the Alpha Trainer), RRA was granted a 15 percent discount on the list prices published on Pipistrel's website.  With respect to the Panthera, the discount was 10 percent. This

"discount" was considered as commission that RRA would earn by virtue of sale of the Pipistrel aircraft.

63.     The Distribution Contract also sets forth the sales procedures that were to be followed.  In summary, once RRA entered into a written agreement with its customer to purchase a Pipistrel aircraft, RRA was required, pursuant to the requirements of Section 9.1 of the Distribution Contract, to notify Pipistrel of the sale and forward the customer's full contact information and the aircraft order details.  Pipistrel was required to accept all orders that complied with Section 9.1, subject to availability.  The Distribution Contract provided that "Pipistrel shall not unreasonably reject orders received" from RRA.  RRA was required to obtain a deposit from the customer, which it then forwarded to Pipistrel.  Upon completion of manufacturing of the aircraft, the customer would make the final payment to RRA, which would then forward that payment to Pipistrel.  The custom and practice between Pipistrel and RRA as it relates to this final payment was that RRA would deduct its agreed upon commission (discount) from this final payment and forward the netted amount to Pipistrel.

64.     Section 21.1 of the Distribution Contract states "[t]his Contract enters into force on the date of signature and shall remain in force for a period of 2 years (24 months) but is modified by other sections and parts of the Distribution Contract to make this contract a long term agreement between Pipistrel and RRA. "   Given the amount of time, effort and money that was going to be required by RRA to fulfill its duties as Pipistrel's distributor, RRA was understandably concerned about the duration of the agreement.  This issue was specifically raised during negotiations and the last edit made to the Distribution Contract was meant to specifically address the issue.  In an e-mail exchange with Mr. Boscarol, he suggested adding the following language to Annex Three of the Distributorship Agreement: "[b]oth parties agrees (sic) that the agreed and signed guidelines in the attached PowerPoint presentation will be respected to set and maintain

the distribution.  Distributor will regularly monthly inform (sic) Pipistrel in writing about the activities in accordance with this document."  The "signed guidelines" referred to the Distributor Plan previously submitted by RRA. The Distributor Plan set forth sales projections for various aircraft.  Ultimately, the parties agreed to include this language in the Distribution Contract and signed and attached the Distributor Plan to the Distribution Contract.  Accordingly, based on the language added to Annex Three by Pipistrel, so long as RRA met the sales projections set forth in the Distribution Plan, the Distribution Contract would be "maintained" and the contract would not terminate after 24 months, but instead continue into the future for a long period of time with no particular termination date as long as RRA performed in accordance with the Distribution Plan.

65.    In fact, Mr. Boscarol stated during the negotiations with RRA "I am sure we are establishing a long term, strong cooperation in the benefit (sic) of RRA, Pipistrel, local dealers and especially the customers."  On the day the Distribution Contract was signed, Mr. Boscarol e-mailed "I am convinced that this is the first step to a long term successful partnership.  I am happy that we will finally have a financially and technically strong and skilled distributor in the USA." Unfortunately, Textron and Textron eAviation would soon have different ideas about RRA's work for, and future with, Pipistrel.

66.    After the Distribution Contract was signed, RRA immediately got to work.  The amount of time and expense incurred by RRA was enormous.  For starters, RRA was required to purchase six different Pipistrel aircraft for demonstration purposes.  RRA created a new website using the services of a search engine optimization firm to ensure maximum website traffic.  RRA updated Pipistrel's social media presence and in that regard created numerous videos and purchased advertising.  In order to establish its dealership network, RRA took more than 25 trips throughout the country to identify and interview potential dealers.  RRA invested heavily in infrastructure and equipment such as new systems software and phone systems, additional tooling

equipment specific for Pipistrel aircraft, and trucks, trailers and a recreational vehicle for use at trade shows.  RRA also hired additional personnel and incurred significant additional expense in connection with its existing insurance coverage.  In summary, RRA was "all in" on its relationship with Pipistrel.

### 2.  Textron Acquires Pipistrel — Textron eAviation Enters the Picture

67.    Not long after the execution of the Distribution Contract, RRA learned that Pipistrel was being acquired by Textron.  Specifically, on March 17, 2022, RRA received an e-mail from Mr. Boscarol with "Exciting News for Pipistrel Distributors."  In announcing the deal with Textron, Mr. Boscarol informed RRA that "Textron is excited to work with Pipistrel's international distributors and values your market expertise and customer relationships as integral to our growth plans."

68.    The next day, on March 18, 2022, RRA received a memorandum from Pipistrel entitled "Pipistrel Distributors Frequently Asked Questions."  (Exhibit H).  Under the "Key Points" portion of the memorandum, it is explicitly stated that "[e]xisting distribution, sales and service relationships remain intact."  In response to the question "[w]hat will the deal mean for Pipistrel's existing sales channels/distributor?" the memo states that "[w]e're excited to work with Pipistrel's distribution network and will continue to rely on current distributors for their sales and customer support expertise.  We do not have plans to change these beneficial relationships."  In response to the specific issue of whether "Textron eAviation" would be cancelling contracts with Pipistrel distributors, RRA was assured "[w]e do not have plans to cancel any agreements, and we value the relationships and expertise current Pipistrel distributors provide to the company's global customer base."  RRA was also informed that "[w]e will continue to evaluate each distributor on their individual performance and customer satisfaction in line with the current agreements."

69.     On top of its existing contract and the foregoing further written assurances, RRA also received verbal assurances from Textron eAviation's President, Rob Scholl.  For instance, Mr. Scholl visited RRA's facility in Inverness, Florida on March 29, 2022, just a few days after the acquisition was publicly announced.  At this meeting RRA expressed concern to Mr. Scholl about its position as the exclusive U.S. Distributor for Pipistrel.  Mr. Scholl assured RRA that the intent was to continue everything "business as usual" and that he definitely intended to build a strong relationship with RRA.  Additionally, according to Mr. Scholl,  RRA was "needed" and he would be relying upon RRA for the continued future success of Pipistrel.  Mr. Scholl, however, knew none of this was true.  Indeed, during the course of due diligence in connection with the Pipistrel acquisition, Mr. Scholl gave every indication that Textron intended to take over the sale of Pipistrel aircraft sold by RRA, disband the existing distributor network, and work to otherwise injure RRA so that Textron could profit by eliminating RRA from the picture.

70.     At the meeting with RRA in Florida, Mr. Scholl — who appeared to be taking copious notes on his iPad — also obtained significant information regarding RRA's processes and important customer leads that RRA was working on.  With the benefit of 20/20 hindsight, it is now clear that Mr. Scholl was simply getting as much information as possible from RRA before Textron eAviation implemented its plan to tortiously interfere with RRA's Distribution Contract with Pipistrel d.o.o. and Pipistrel Italia and otherwise ruin RRA's business.

71.     The statements made by Textron's CEO, Scott Donnelly, about a month later further demonstrate that the assurances received by RRA were simply not true.  In an earnings call with investors on April 28, 2022, Mr. Donnelly stated that "obviously part of what we're doing with Pipistrel is leveraging [the Textron] sales team all around the world that's selling our aircraft today under the Cessna and Beechcraft brands, will also be out there selling and servicing the Pipistrel brand."  According to Mr. Donnelly, "[i]t's what we do." (Exhibit E).  Likewise, Mr.

Massey remarked in May 2022 that "Textron Aviation and Textron have a global distribution network and sales network that we'll be leveraging." Thus, from the moment Textron considered acquiring Pipistrel, it was its intent to get its existing sales force busy selling Pipistrel aircraft and to damage the efforts of others to do the same. Textron and Textron eAviation accomplished this stated goal by having the RRA Distribution Contract canceled and by otherwise gravely injuring the business of RRA. RRA did not become aware of this statement, or Textron's intent, until after its Distributorship Contract was wrongfully terminated.

### 3. RRA's Agreement with Mesa Airlines — The Beginning of the End

72.     Immediately upon execution of the Distribution Contract, RRA got to work. Indeed, as an accommodation to Pipistrel and Mr. Boscarol, who was having significant issues with his previous distributor, RRA had been assisting Pipistrel informally even before the Distribution Contract was executed. RRA hit the ground running and was well on its way to meeting the sales projections set forth in the Distribution Plan.

73.     A significant area of focus for RRA was fleet sales of Pipistrel aircraft to flight schools and commercial airlines. Because of the airline pilot shortage, airlines were (and are) in dire need of pilots. However, there were not enough small airplanes in the system to accomplish the task of getting all of these pilots trained. One of Pipistrel's products, the Alpha Trainer, was an aircraft perfectly suited to this task. Mesa Airlines ("Mesa") is a commercial regional airline operating out of Phoenix, Arizona. It began operation in 1982 and quickly grew in popularity. It is reported that Mesa currently has 3,400 employees. Mesa, like other airlines, was experiencing a pilot-shortage gap and, to address that shortage, Mesa developed the "Mesa Pilot Development Program." As part of that program, Mesa offered pilots the opportunity to accumulate the 1,500 hours required to fly at Mesa (and other commercial airlines). The training costs incurred by these pilots would be financed by Mesa at zero percent interest and repaid during the first three

years of employment at Mesa.  Mesa had the program; it just needed the planes.  RRA had the solution.

74.    On July 3, 2022, Shavonna Reid, RRA's Director of Sales, was in Slovenia, visiting with Mr. Massey, whom Textron named as the President & Managing Director of Pipistrel after the sale to Textron.  During this visit, Ms. Reid first discussed with Mr. Massey (a former Textron employee) a potential deal RRA was working on with Mesa.  Mr. Massey instructed Ms. Reid to "work out the specifics of the deal" with Tadej Hozic, who had responsibility for the processing of sales on behalf of Pipistrel. Mr. Hozic was a longtime Pipistrel employee and had always been RRA's primary contact for issues relating to pricing, sales, and production capacity. Ms. Reid met with Mr. Hozic the following day and agreed on an initial pricing framework regarding the potential deal with Mesa.

75.    On July 6, 2022, Andrew Chan, the Chief Operating Officer of RRA, followed up Ms. Reid's meeting with Mr. Hozic, with an e-mail to Mr. Hozic indicating that RRA had a customer (Mesa) who was looking for a fleet of Alpha Trainers.  Mr. Chan set forth the proposed delivery schedule: 50 Alpha Trainers to be delivered within 12 months of the contract signing and an option to purchase an additional 50 Alpha Trainers with a delivery schedule of 18 months from the contract signing.  Mr. Hozic responded, "[g]reat . . . I'm already in discussion with purchase and production [to see] if this is doable … for sure will be 😊."  Mr. Chan and Mr. Hozic exchanged e-mails regarding proposed pricing for the deal. Ultimately, there was an understanding on pricing.  In a July 13, 2022 e-mail exchange, Mr. Hozic stated "[a]s we agreed for a discount — 18% on first 50 airplanes and 20% on 50-200 airplanes you also have some margin to play."  In that same e-mail, Mr. Hozic encouraged RRA to "[c]lose the deal asap as I'm running out of free AT production slots for 2022."

76.    At the same time the foregoing discussions were taking place, on July 20, 2022,

RRA and Mesa entered into an Aircraft Purchase Agreement for the purchase of 4 Pipistrel Velis Clubs. By e-mail dated July 21, 2022, Mr. Chan informed Mr. Hozic that the contract for the 4 Velis Clubs had been signed. In that communication he also informed Mr. Hozic that RRA believed that the customer (Mesa) would move forward with the order that they had previously discussed. Mr. Hozic thanked RRA for the "great news." Over the course of the next two days, RRA worked with Mr. Hozic to confirm pricing and production slots for this significant purchase, which Mr. Hozic confirmed by e-mail dated July 23, 2022. According to Mr. Hozic's July 23 e-mail, "I can confirm pricing (see attached file) and the production slots …." Based on this approval by Mr. Hozic on behalf of his company, RRA proceeded with the Mesa deal.

77.     Because of the size of the Mesa transaction (believed to be the second largest sale ever for Pipistrel) and Mesa's importance as a future consumer of Pipistrel products, RRA arranged for a discussion between RRA, Mr. Massey, Mr. Scholl and Mesa. After the call with Mesa, Mr. Massey e-mailed Mr. Chan on August 10, 2022, thanking him for setting up the discussion and asking him to share the terms of the agreement because he wanted to have a better understanding of "how the pricing was set up." According to Mr. Massey, on a multi-year deal "there are pricing escalations built in." Mr. Chan responded to Mr. Massey on August 12, 2022, stating that RRA had already received the appropriate approval from Mr. Hozic and the Pipistrel sales team. He also informed Mr. Massey that Mesa had already obtained Board of Directors' approval to proceed forward with the transaction. In a further e-mail exchange with Mr. Massey on August 18, 2022, Mr. Chan stated that "[w]ith respect to pricing, I believe you can agree that we followed proper procedure, got approval from the Sales team verbally — then confirmed in writing," and he provided proof of the approval to Mr. Massey. Mr. Chan concluded "[a]t this point, it is too late to change the pricing structure, as it has been factory approved and in the client's hands for more than a month." Mr. Chan forwarded the agreement to Mr. Massey

indicating that the agreement was likely to be signed by Mesa on that day or the next.  Mr. Chan was correct.

78.     On August 18, 2022, Mesa executed the 25 Aircraft Purchase Agreement, which RRA, through Mr. Chan, executed on August 19, 2022 (the "Mesa Agreement").  Pursuant to this agreement, Mesa agreed to purchase 25 Pipistrel Alpha Trainers.  Mesa also had the option to purchase an additional 75 Pipistrel Alpha Trainers.  On November 3, 2022, Mesa exercised its option to purchase an additional 25 Pipistrel Alpha Trainers under the Mesa Agreement.  Through this one deal alone, RRA stood to make almost $2 million in commissions.  Furthermore, because Mesa was not the only commercial airline suffering from an acute pilot shortage, RRA had numerous other active leads for fleet sales with other airlines that it was pursuing.  It was expected by all that this agreement with Mesa would lead to substantial additional fleet sales in the very near future, resulting in very substantial compensation to RRA under the terms of the Distribution Contract.  With the execution of the agreement between RRA and Mesa, RRA hoped that the Mesa matter was closed; however, Textron and Textron eAviation had other ideas.

### 4.  Textron and Textron eAviation — Tortious Interference and Other Misconduct, Part 2

79.     After the Mesa Agreement was signed, Mr. Massey and Mr. Chan continued to exchange e-mails with respect to Mesa.  Even though the Mesa Agreement had already been signed and was a fully enforceable and valid agreement, Mr. Chan valued RRA's relationship with Pipistrel and thus was willing to continue to try and work through the "issues" that Mr. Massey had allegedly identified regarding the deal.  On August 29, 2022, Mr. Massey forwarded Mr. Chan the pricing proposal that Pipistrel would be willing to accept.  This proposal came after discussions between Pipistrel and Textron and/or Textron eAviation.  Mr. Massey also indicated that it "[w]ould be good to quickly discuss how'd you'd like to approach Mesa, Rob [Scholl] has

an idea that I'd like to run by you." At this point it became crystal clear that Textron and Textron eAviation were driving these discussions and were actively interfering with RRA's rights under the Mesa Agreement and otherwise trying to damage RRA, so as to eliminate it from the market. Pipistrel was not calling the shots. In fact, Mr. Massey, the purported president and managing director of Pipistrel, had specifically told RRA that he could not get the Mesa deal "approved." Since Mr. Massey was the chief executive officer of Pipistrel, under ordinary circumstances he would be the ultimate authority. But, these were not ordinary circumstances. He was having to answer to Textron and/or Textron eAviation, which were in the process of interfering with the RRA's contractual relationship with Mesa and otherwise damaging the company so as to eliminate it from the picture.

80.    Mr. Chan responded to Mr. Massey's proposal noting that the "commission structure is greatly reduced from both our contractually guaranteed percentages, and the percentages provided by the Sales team in July." Further, Mr. Chan noted that "the deal as you proposed is economically detrimental to RRA." Nevertheless, Mr. Chan expressed a desire to see if they could make something work but stated that RRA would need an immediate and unqualified 3-year extension of its agreement "so that we may optimize our sales with assurance and confidence." This guaranteed extension had been promised to RRA for months by both Mr. Scholl and Mr. Massey. Although RRA fully expected to "maintain" its distributorship per the Distribution Contract and the Distributor Plan incorporated therein — and indeed, the Distribution Contract was in fact maintained at all times relevant to this Complaint — when it became clear that Textron and Textron eAviation were "calling the shots" at Pipistrel, RRA had expressed concerns to both Mr. Scholl and Mr. Massey. RRA was assured by Mr. Scholl and Mr. Massey that RRA would be provided with an unqualified three-year extension. In response to Mr. Chan's specific request, Mr. Massey indicated that he could commit to getting RRA a draft agreement

for consideration by September 16, 2022.

81.    Ultimately, Mr. Scholl of Textron eAviation began inappropriately renegotiating the existing deal *directly with the President of Mesa*.  All of this occurred even though RRA and Mesa already had an agreement and Textron eAviation did not own Pipistrel.  Indeed, pursuant to the terms of the Mesa Agreement, Mesa paid the required deposit to RRA, which RRA forwarded to Pipistrel and which Pipistrel eagerly accepted.  Despite accepting this deposit, on September 22, 2022, Pipistrel informed RRA that it would not agree to provide the aircraft under the terms of the Mesa Agreement, and Mr. Scholl of Textron eAviation indicated that the pricing and discount structure would not be honored by Pipistrel.  On that same day, however, Mesa issued a press release with respect to its purchase of the Pipistrel aircraft from RRA.  Simply stated, while Textron and Textron eAviation were interfering with the contractual relationship between Mesa and RRA and otherwise trying to damage RRA so as to ruin the company and get it out of the picture, Mesa fully understood that it had a binding agreement with RRA and that it fully intended to move forward with its purchase of the Alpha Trainers from RRA.

82.    Mr. Massey had promised to forward a proposed extension of the Distribution Contract to RRA by September 16, 2022, but he did not do so until September 26, 2022.  The proposed agreement was nothing short of remarkable, and not in a good way.  For starters, the proposed "Territory" that was to be serviced by RRA was undefined and there was no indication that RRA would remain an "exclusive" distributor.  Perhaps more disturbing was the proposed provision in the draft that dealt with fleet sales (defined as five or more aircraft), such as the deal that RRA had with Mesa.  In other words, under this newly proposed agreement, RRA would no longer have the automatic rights (much less exclusive rights) to make fleet sales.  The draft provided that "[d]istributor will inform Pipistrel of any fleet sales taking place within the Territory.  Pipistrel reserves the right to sell directly to any fleet customer without the involvement

of the Distributor.  Any compensation payable by Pipistrel in connection with the direct sale will be determined at the sole discretion of Pipistrel."  It became obvious what Textron and Textron eAviation had in mind for RRA's future — a miniscule or nonexistent role with no fleet sales.

83.     Prior to the Pipistrel acquisition, RRA was receiving 50 to 60 sales leads per month from Pipistrel.  Under the terms of the Distribution Contract (Section 6.1), Pipistrel was required to forward all "sales inquiries" received from the United States to RRA.  Once Pipistrel was acquired by Textron, RRA stopped receiving leads.  To be clear, the sales leads dropped from 50 to 60 a month to zero after Pipistrel was acquired.  When RRA brought this precipitous drop off to Mr. Scholl's attention, RRA then received a handful of leads (5 to 10) from Pipistrel.  That step was purely cosmetic; the Defendants were still interested in eliminating the business of RRA so that it could have the playing field all to itself.

84.     Other misconduct occurred in June of 2022.  At Mr. Scholl's specific request, RRA personnel drove RRA's motorcoach trailer with a Pipistrel Velis Electro aircraft to the "UP Summit" air show in Bentonville, Arkansas.  Upon arrival at the air show and after setting up the aircraft, event staff informed RRA that only Textron and/or Textron eAviation were allowed to display aircraft (which would include Pipistrel aircraft) at the event.  Mr. Scholl assured RRA that this was an error on the part of the event organizer.  However, based upon discussions that RRA had later with the event organizer, it was clear that Mr. Scholl had not been truthful in that regard and that it was Textron and/or Textron eAviation that had directed that RRA not be allowed to participate in the "UP Summit" event.  Thus, at this event, Textron eAviation promoted and sold Pipistrel aircraft during and after the event instead of RRA, even though RRA was the exclusive U.S. Distributor for Pipistrel.  This cutting off of an important sales opportunity for RRA was consistent with Textron and Textron eAviation's desire to destroy RRA's business.

85.     It is significant that the foregoing occurred on June 6, 2022, the same date that Mr.

Scholl handed Textron eAviation's termination letter to Declan. These events were clearly coordinated and designed to eliminate other potential sellers from the market. That day, Mr. Scholl texted Mr. Chan about the termination of Declan and assured him, falsely as it turns out, that RRA did not "need to be nervous about it" and that it "has nothing to do with the dealers." In a conversation later that day, Mr. Scholl informed Mr. Chan that Declan's relationship with Pipistrel had been terminated because Mr. Wood was not a "team player." Mr. Chan was well familiar with Mr. Wood because they had worked successfully together on Pipistrel matters in the past and Mr. Chan did not believe this was a truthful characterization of why Declan had been provided a termination letter by Textron eAviation. This disparagement is likewise consistent with Textron's effort to destroy RRA's business.

86.    In July of 2022, the EAA Airventure Oshkosh Airshow was conducted. This is the most famous airshow in the world with over 650,000 attendees. RRA had a booth set up at the show in a prime location where it was displaying Pipistrel products. At that airshow, Textron Aviation (a business unit of Textron) was displaying an actual Pipistrel Velis Electro despite the fact that RRA was the exclusive U.S. Distributor for that product. This aircraft had previously been acquired from RRA at Mr. Scholl's specific request. Mr. Scholl stated (untruthfully apparently) that this aircraft was being acquired for Textron Aviation's employee flying club. More troubling, however, was that Mr. Scholl and others came over to the RRA booth to take pictures of themselves in front of some of the Pipistrel aircraft that RRA was displaying. Those pictures were then posted on Pipistrel's LinkedIn and people were encouraged to contact Mr. Scholl "of Textron eAviation," instead of RRA, if they were interested in learning more about the products.

87.    With all of the foregoing as a backdrop, upon receipt of the revised proposed distribution agreement (providing a carve-out for fleet sales), RRA recognized that it had plenty

"to be nervous about" and it was clear that Textron and Textron eAviation intended to do everything within their power to take over RRA's business with Pipistrel and otherwise put RRA out of business.

88.    RRA thus engaged counsel to assist it with the issues it was having with Pipistrel, Textron and Textron eAviation with respect to the Mesa Agreement.  By letter dated October 14, 2022, counsel for RRA sent a letter to Pipistrel (to the attention of Mr. McKenna, a former Textron employee and current Director of Sales and Marketing for Pipistrel) outlining the numerous breaches of the Distribution Contract relating to the Mesa Agreement.  On that same day, Fletcher Thomson, General Counsel for Textron eAviation, e-mailed counsel for RRA requesting a call or a meeting that occurred virtually on October 14, 2022.  Prior to August 1, 2022, Mr. Thomson had been senior associate general counsel for Textron. Mr. Thomson followed up with a letter (on Textron eAviation letterhead) dated October 20, 2022, outlining Textron eAviation's views as to why the Distribution Contract had not been breached in regard to the Mesa Agreement.  Mr. Thomson concluded his letter with an ominous foreshadowing of what was to come.  According to Mr. Thomson "[t]here are several other issues that have been brought to my attention, as it relates to the Pipistrel-RRA relationship that also require resolution."  Textron and Textron eAviation were setting the stage for the termination of RRA's Distribution Contract.  In the meantime, however, that had to wait because Textron and Textron eAviation had additional malice and misconduct to direct towards RRA.

89.    RRA was scheduled to participate in the 2022 NBAA Business Aviation Convention & Exhibition in Orlando, Florida from October 18-20, 2022; however, RRA was instructed by Textron eAviation's General Counsel, Fletcher Thomson, not to appear at this show. Fearing that Textron and/or Textron eAviation intended to participate in that show and market Pipistrel products, RRA, as exclusive U.S. Distributor of these products, specifically warned

Textron and Textron eAviation that this should not occur.  Nevertheless, that is exactly what happened as evidenced by the picture of Mr. Scholl at that airshow in front of a Pipistrel aircraft with a Textron eAviation sign displayed prominently over his shoulder, which was posted on Textron eAviation's LinkedIn page.  RRA was not only being cut out of a contract, but it was also being cut out of business overall. Indeed, Textron eAviation's LinkedIn page encourages prospective buyers to "[m]ake sure you come check out the latest in aviation at the ***Textron eAviation*** booth."  (emphasis added). These trade shows are critical to sales, and Textron and Textron eAviation knew that, which is precisely why they moved to block RRA's access to the trade show while simultaneously marketing Pipistrel's products at their own booth.  The old adage that "a picture is worth a thousand words" is on full display below.



90.     On November 11, 2022, Textron and Textron eAviation implemented their plan to get rid of RRA by directing Pipistrel (through its counsel) to send RRA a letter terminating the

Distribution Contract.  In that letter, Pipistrel sets forth a litany of alleged grounds for termination. Like the Declan termination letter, however, the reasons set forth in the RRA termination letter are entirely bogus and pretextual. In fact, just a few months before this termination, Mr. Scholl had praised RRA to Flying Magazine when he asserted that when Andy Chan and Shavonna Reid of RRA tell us something about Pipistrel products, we listen.  In the weeks leading up to the termination, RRA, at Mr. Scholl's request, had given educational presentations on the Pipistrel products to over 100 of Textron's Cessna Pilot Centers.  RRA also provided training to Textron's existing sales force in Tampa, Florida.  RRA had been assured that even if sales were made through this sales force, RRA would be entitled to receive its commissions off these sales.  Indeed, just one day prior to its termination, RRA had been expected to give a presentation on its sales success in the United States and to share "what works and what doesn't" with Pipistrel's global distributors.  This was intended to be an in-person event in Slovenia and Italy.

91.    With Textron eAviation at the helm on December 5, 2022, Mr. Massey forwarded Mesa a revised agreement with respect to the purchase of the Alpha Trainers, despite the fact that the Mesa Agreement was valid and binding.  Textron and Textron eAviation's mission was nearly complete.  Not merely satisfied with causing the wrongful termination of RRA's Distribution Contract, they also wanted to completely cut RRA out of the Mesa transaction and to otherwise ruin its business, including by encouraging litigation against RRA, as identified below.  In other words, a large multi-billion company once again attempted to bully and intimidate a small, locally owned business. Indeed, by letter dated March 17, 2023, Mesa provided RRA with a Notice of Cancellation with respect to the Mesa Agreement.  The basis for the termination was that no aircraft had been delivered to Mesa.  Pursuant to Section 4.1 of the Distribution Contract, however, RRA had already instructed Pipistrel in writing to deliver the planes to Mesa.  Pipistrel, which had already accepted the deposits for these planes, simply failed to deliver them to Mesa

in accordance with the Distribution Contract and no commissions were paid to RRA. Instead, because of the tortious interference by Textron and Textron eAviation, Mesa cancelled the Mesa Agreement and entered into a new contract directly with Pipistrel. As far as Textron and Textron eAviation are concerned, it was "Mission Accomplished" as it relates to the Mesa Agreement.

92.    Despite wrongfully causing the Distribution Contract and Mesa Agreement to be wrongfully terminated, Textron and Textron eAviation were still not satisfied. At the time of the wrongful termination of the Distribution Contract, RRA had obtained numerous agreements with various customers to purchase approximately 30 Pipistrel aircraft. These agreements were not only fully executed, but deposits (or full payments) were also made by the customers, which were forwarded to, and accepted by, Pipistrel. Indeed, in most instances these aircraft are already being manufactured by Pipistrel and in some cases the aircraft are complete and ready to be delivered to RRA's customers. Rather than deliver the aircraft to RRA's customers as required by Section 4.1 of the Distribution Contract, Pipistrel, no doubt at the behest of Textron and Textron eAviation, is requiring, or has required, RRA's customer to enter into new contracts with Pipistrel to get the aircraft. In the letter accompanying the proposed new contract, Mr. Massey informed RRA's customer that "[i]n order to proceed with and complete the order, we are required to contract with you directly, which will require a new order document documentation." This is both false and outrageous. The brazen misconduct evinces an intent to destroy the business of RRA, not just with respect to Mesa, but overall within the industry.

93.    The foregoing actions not only tortiously interfere with RRA's contracts with its customers, but these actions also appear to be an attempt to deny RRA the commission it has earned by virtue of these sales and also to destroy RRA's reputation and business. As explained above, the practice between RRA and Pipistrel had always been that when RRA forwarded the final payment to Pipistrel for the aircraft(s), RRA would deduct its commission from the amounts

40

sent to Pipistrel. The proposed new contract forwarded to RRA's customers specifically provides that the customer "agrees to and hereby assigns to Pipistrel any and all rights, past, current and future, and whether ripe or contingent, to seek recovery from RRA of the Wrongfully Retained Payments." The phrase "Wrongfully Retained Payments" is not defined in the contract but appears directed towards RRA's commission. The proposed new contract also requires the customer to cooperate with Pipistrel in obtaining the "Wrongfully Retained Payment," with such cooperation including "providing RRA with notice of termination of the previous purchase order" and "making demand on RRA for return of the payment." Textron and Textron eAviation's tortious interference knows no limits. They apparently will not be satisfied until RRA is wrongfully stripped of every right and benefit that flowed from the Distribution Contract and from its inherent right to operate a business uninterrupted by the malice and disparagement of others.

94.     The United States constitutes approximately 70% of the aviation market, so it is not surprising that RRA would be a target for termination given Mr. Donnelly's stated goal to get Textron's sales team "out there selling and servicing the Pipistrel brand." Pipistrel/Textron/Textron eAviation are in the process of setting up a new distribution network in the United States with multiple distributors under terms and conditions no doubt dictated by, and more favorable to, Pipistrel/Textron/Textron eAviation than the Distribution Contract RRA had with Pipistrel. They are also in the process of attempting to steal the dealership network that RRA spent so much time, effort, and expense establishing. RRA also understands that there have been other distributors throughout the world that have also been terminated since the Pipistrel acquisition. Textron and Textron eAviation have been busy accomplishing Mr. Donnelly's stated goals. These ruthless efforts to ruin RRA are driven by greed and criminal indifference to civil obligations.

95.     RRA has been damaged by Textron and Textron eAviation's tortious interference and other malice. If the Distribution Contract had not been wrongfully terminated and/or if RRA had been allowed to operate in the absence of such malice, then RRA would have been paid multiple millions of dollars in additional commissions and payments relating to aircraft sales, parts sales, maintenance, and expansion of RRA's business model via sales and agreements with other aircraft customers and RRA's dealership network.

## V.  CAUSES OF ACTION

### Count One

### Tortious Interference with Declan's 2022 Contract with Pipistrel Vertical and Other Malicious Conduct of the Defendants

96.     Declan incorporates the allegations contained in paragraphs 1 through 11 and paragraphs 24 through 59 as if fully set forth fully herein.

97.     The 2022 Contract is a valid and enforceable contract that exists between Declan and Pipistrel Vertical.

98.     Declan performed all its obligations under the 2022 Contract.

99.     Textron and Textron eAviation knew of the existence of the 2022 Contract.

100.    Textron and Textron eAviation intentionally and tortiously interfered with the 2022 Contract, without justification, in order to induce or otherwise cause Pipistrel Vertical to breach the 2022 Contract. Textron and Textron eAviation intended to cause a breach of the 2022 Contract by Pipistrel Vertical and, in fact, did cause such breach.

101.    Textron and Textron eAviation  are strangers to the 2022 Contract since neither owned Pipistrel Vertical at the time the 2022 Contract was executed. Moreover, and upon information and belief, Textron eAviation is a stranger to the 2022 Contract because it is not in a parent/subsidiary relationship with Pipistrel Vertical. Accordingly, Textron eAviation's

interference with the 2022 Contract was not a good faith effort to protect a legal or economic interest. Likewise, Textron is not in a direct parent/subsidiary relationship with Pipistrel Vertical and its wrongful conduct was not a good faith effort to protect a legal or economic interest.

102.    Textron and Textron eAviation acted for the purpose of misappropriating the benefits of Declan's 2022 Contract for themselves. They intended to, and they did, steal those benefits for themselves.

103.    Furthermore, Textron eAviation, at Textron's instructions, made misrepresentations and used improper means when it tortiously interfered with the 2022 Contract. Textron eAviation represented that continued cooperation between the Contracting Parties to the 2022 Contract was impossible because of a change in ownership due to an asset sale. As shown herein, continued cooperation was not only possible but occurred for several months after Pipistrel was sold. Hence, this statement was not true and was, in fact, a lie. Likewise, the claim that the sale was an asset sale is also not true since the sale was an equity purchase and Pipistrel continues to exist.

104.    Textron eAviation also represented to Declan that it no longer intended to sell the products that Declan had marketed. This statement is not true as evidenced by the fact that these products are continuing to be marketed and sold.

105.    Textron and Textron eAviation's wrongful conduct, malicious acts and bad faith motives are clear. They are evidenced by the misrepresentations described herein, including representing that the Pipistrel sale was an asset sale, the pretextual use of the impossibility defense, and the claim that it no longer wished to sell the products Declan had marketed. It is further evidenced by Textron and Textron eAviation's understanding that Declan's pay structure was more favorable than the pay structure Textron and/or Textron eAviation offered its own aircraft sales and support network. Thus, after Mr. Wood declined Textron eAviation's lowball

offer of employment, Textron and Textron eAviation wrongfully interfered with the 2022 Contract and lied to Declan when it did so.

106.    Textron and Textron eAviation's actions in relation to the 2022 Contract did not consist of a lawful disclosure of truthful facts to another.  Textron and Textron eAviation's actions in relation to the 2022 Contract did not consist of lawful and good-faith efforts to protect a legal interest.  Textron and Textron eAviation's actions in relation to the 2022 Contract did not consist of lawful and good-faith efforts to protect an economic interest in the 2022 Contract.

107.    Declan has been damaged in an amount to be determined at trial, including amounts presently due, amounts presently known to be due in the future and the acceleration of Declan's Commission and Hourly Fees it would have earned had Textron and Textron eAviation not tortiously interfered with the 2022 Contract or otherwise acted with malice.

108.    The tortious interference with Declan's contract is manifest, but the Defendants' actions go far beyond just that. As part of a concerted effort to ruin Declan's business, these additional actions include but are not limited to:

• the intentionally false characterization of the true terms of the Textron-Pipistrel transaction;

• the ginned-up impossibility defense;

• the outright lies about discontinuing the product lines that Declan was contractually entitled to support;

• the ruining of other actual and likely contracts;

• the disparagement of Declan;

• the obstruction of the payment of financial commissions already due and owed; and

• the setting up of meetings with hidden or falsely promoted agendas, all of which speak to malice, lack of moral turpitude, and illicit plans and acts that were conceived in criminal

mischief or with criminal indifference to the civil obligations involved.

109.    Textron and Textron eAviation's conduct was malicious, wanton, reckless, and willful, thus entitling Declan to an award of punitive damages under applicable law. Moreover, all of the actions of the employees and agents of Textron and Textron eAviation were undertaken with the knowledge and consent of the Defendants or were otherwise ratified by the subsequent conduct and statements of these Defendants.

<u>**Count Two**</u>

<u>**Tortious Interference with RRA's Distributorship Contract with Pipistrel d.o.o. and Pipistrel Italia and Other Malicious Conduct of the Defendants**</u>

110.    RRA incorporates the allegations contained in paragraphs 1 through 11, paragraphs 24 through 26, and paragraphs 60 through 95 as if fully set forth fully herein.

111.    The Distribution Contract is a valid and enforceable contract that exists between RRA and Pipistrel d.o.o. and Pipistrel Italia.

112.    Textron and Textron eAviation knew of the existence of the Distribution Contract.

113.    Textron and Textron eAviation intentionally and tortiously interfered with the Distribution Contract, without justification, in order to induce or otherwise cause Pipistrel d.o.o. and Pipistrel Italia to breach the Distribution Contract. Textron and Textron eAviation intended to cause a breach of the Distribution Contract by Pipistrel d.o.o. and Pipistrel Italia and, in fact, did cause such breach.

114.    Textron and Textron eAviation are strangers to the Distribution Contract since neither owned Pipistrel d.o.o. or Pipistrel Italia at the time the Distribution Contract was executed. Moreover, Textron eAviation is a stranger to the Distribution Contract because it is not in a parent/subsidiary relationship with Pipistrel d.o.o. or Pipistrel Italia. Accordingly, Textron eAviation's wrongful interference with the Distribution Contract was not a good faith effort to

protect a legal or economic interest. Likewise, Textron is not in a direct parent/subsidiary relationship with Pipistrel d.o.o. or Pipistrel Italia and its wrongful conduct was not a good faith effort to protect a legal or economic interest.

115.    Textron and Textron eAviation acted for the purpose of appropriating the benefits of RRA's Distribution Contract for themselves.

116.    Textron and Textron eAviation's wrongful conduct, malicious acts and bad faith motives are clear. They are evidenced by its misrepresentations with respect to their intentions relating to the Pipistrel distribution network.  Despite repeated assurances to RRA that they intended to maintain the relationship with RRA, those were  knowingly untrue statements.  The statement of Textron's CEO, Scott Donnelly, on April 28, 2022 that "[b]y the way, obviously part of what we're doing with Pipistrel is leveraging [the Textron] sales team all around the world that's selling our aircraft today under the Cessna and Beechcraft brands, will also be out there selling and servicing the Pipistrel brand" is further evidence of bad-faith motives.  Furthermore, Textron and Textron eAviation's bad faith motives are amply on display with respect to their conduct in connection with the Mesa deal described above.  Offering up a proposed revision to the Distribution Contract that would exclude fleet sales speaks volumes.  Textron and Textron eAviation wanted that business for themselves and were willing to take whatever steps were necessary (even if malicious and wrongful) to accomplish that goal.

117.    Textron and Textron eAviation's actions in relation to the Distribution Contract did not consist of a lawful disclosure of truthful facts to another.  Textron and Textron eAviation's actions in relation to the Distribution Contract did not consist of lawful and good-faith efforts to protect a legal interest.  Textron and Textron eAviation's actions in relation to the Distribution Contract did not consist of lawful and good-faith efforts to protect an economic interest in the Distribution Contract.

118.    RRA has been damaged in an amount to be determined at trial, including amounts presently due, amounts presently known to be due in the future and the acceleration of the commissions it would have earned had Textron and Textron eAviation not tortiously interfered with the Distribution Contract.

119.    The tortious interference with RRA's contract is manifest, but the Defendants' actions go far beyond just that. As part of a concerted effort to ruin the business of RRA, these additional actions include but are not limited to:

• the cutting off of RRA from appearances at trade shows;

• the suppression of business leads to RRA for additional sales;

• the stealing of the Mesa Contract;

• the ruining of other actual and likely contracts;

• the disparagement of RRA;

• the encouragement of baseless lawsuits to be filed against RRA;

• the obstruction of the payment of financial commissions already due and owed;

• the promotion of falsehoods about continuing business with RRA while Defendants were actively undermining such efforts;

• the setting up of meetings with hidden or falsely promoted agendas; and

• the other attempts to destroy the RRA's businesses, all of which speak to malice, lack of moral turpitude, and illicit plans and acts that were conceived in criminal mischief or with criminal indifference to the civil obligations involved.

120.    Textron and Textron eAviation's conduct was malicious, wanton, reckless, and willful, thus entitling RRA to an award of punitive damages under applicable law. Moreover, all of the actions of the employees and agents of Textron and Textron eAviation were undertaken with the knowledge and consent of the Defendants or were otherwise ratified by the subsequent

conduct and statements of these Defendants.

## **Count Three**

### **Tortious Interference with the Mesa Agreement and Other Malicious Conduct of the Defendants**

121.    RRA incorporates the allegations contained in paragraphs 1 through 11, paragraphs 24 through 26, and paragraphs 72 through 95 118 as if fully set forth fully herein.

122.    The Mesa Agreement is a valid and enforceable contract that exists between RRA and Mesa.

123.    Textron and Textron eAviation knew of the existence of the Mesa Agreement.

124.    Textron and Textron eAviation intentionally and tortiously interfered with the Mesa Agreement, without justification, in order to induce or otherwise cause Mesa to breach or terminate the Mesa Agreement. Textron and Textron eAviation intended to cause a breach or termination of the Mesa Agreement by Mesa and, in fact, did cause such termination.

125.    Textron and Textron eAviation are strangers to the Mesa Agreement. Specifically, Textron eAviation is a stranger to the Distribution Contract because it is not in a parent/subsidiary relationship with Pipistrel d.o.o. or Pipistrel Italia. Accordingly, Textron eAviation's wrongful interference with the Distribution Contract was not a good faith effort to protect a legal or economic interest. Likewise, Textron is not in a direct parent/subsidiary relationship with Pipistrel d.o.o. or Pipistrel Italia and its wrongful conduct was not a good faith effort to protect a legal or economic interest.

126.    Textron and Textron eAviation acted for the purpose of appropriating the benefits of the Mesa Agreement for themselves.

127.    Textron and Textron eAviation's wrongful conduct, malicious acts and bad faith motives are clear. They are evidenced by the fact that, despite Pipistrel's pre-approval of the

pricing in the Mesa Agreement, Textron and Textron eAviation (through Mr. Scholl, among others) began efforts to re-negotiate the deal in a way that would provide less compensation to RRA.  Furthermore, the fact that RRA was presented with a proposed revision to the distribution arrangement that carved out fleet sales speaks volumes of ill intent and actions.  Textron and Textron eAviation did not want RRA to earn the substantial commissions that would undoubtedly flow to RRA by virtue of the Mesa Agreement and/or additional fleet sales.  Textron and Textron eAviation wanted those monies for themselves. Their conduct is motivated by abject greed and avarice.

128.    Textron and Textron eAviation's actions in relation to the Mesa Agreement did not consist of a lawful disclosure of truthful facts to another.  Textron and Textron eAviation's actions in relation to the Mesa Agreement did not consist of lawful and good-faith efforts to protect a legal interest. Textron and Textron eAviation's actions in relation to the Mesa Agreement did not consist of lawful and good-faith efforts to protect an economic interest in the Mesa Agreement.

129.    RRA has been damaged in an amount to be determined at trial, including amounts presently due, amounts presently known to be due in the future, and the acceleration of the commissions it would have earned had Textron and Textron eAviation not tortiously interfered with the Mesa Agreement.

130.    Textron and Textron eAviation's conduct was malicious, wanton, reckless, and willful, thus entitling RRA to an award of punitive damages under applicable law. Moreover, all of the actions of the employees and agents of Textron and Textron eAviation were undertaken with the knowledge and consent of the Defendants or were otherwise ratified by the subsequent conduct and statements of these Defendants.

## VI. JURY DEMAND

131.    Declan and RRA demand that this matter be tried before a jury.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Declan and RRA request that this Court enter judgment as follows:

1.    Judgment on Count One in favor of Declan against Textron and Textron eAviation in an amount to be determined at trial, but at this point believed to be in excess of $50,000,000 (Fifty Million Dollars) representing the actual damages suffered by Declan by virtue of Textron and Textron eAviation's wrongful conduct;

2.    Judgment for punitive damages on Count One in favor of Declan against Textron and Textron eAviation in an amount to be determined at trial by virtue of Textron and Textron eAviation's wanton, reckless and willful conduct;

3.    Judgment on Count Two in favor of RRA against Textron and Textron eAviation in an amount to be determined at trial, but at this point believed to be in excess of $100,000,000 (One Hundred Million Dollars) representing the actual damages suffered by RRA by virtue of Textron and Textron eAviation's wrongful conduct;

4.    Judgment for punitive damages on Count Two in favor of RRA against Textron and Textron eAviation in an amount to be determined at trial by virtue of Textron and Textron eAviation's wanton, reckless and willful conduct;

5.    Judgment on Count Three in favor of RRA against Textron and Textron eAviation in an amount to be determined at trial, but at this point believed to be in excess of $1,900,000 representing the actual damages suffered by RRA by virtue of Textron and Textron eAviation's wrongful conduct;

6.    Judgment for punitive damages on Count Three in favor of RRA against Textron and Textron eAviation in an amount to be determined at trial by virtue of Textron and Textron

eAviation's wanton, reckless and willful conduct;

7.       Prejudgment and post-judgment interest as allowed by law;

8.       For costs of suit;

9.       For attorneys' fees, costs of investigation and litigation; and

10.      For such other and further relief as this Court deems just and proper.

Respectfully submitted this 11th day of May, 2023.

BAILEY GLASSER LLP

_/s/ James L. Kauffman_
James L. Kauffman (Florida Bar No. 12915)
Brian A. Glasser (_pro hac forthcoming_)
John G. Turner III (_pro hac forthcoming_)
Robert R. Bell III (_pro hac forthcoming_)
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
jkauffman@baileyglasser.com
bglasser@baileyglasser.com
jturner@baileyglasser.com
rbell@baileyglasser.com